743 So.2d 284 (1999)
STATE of Louisiana, Appellee,
v.
Carlos Ray ARMSTRONG, Appellant.
No. 32,279-KA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1999.
*287 Louisiana Appellate Project by Wilson Rambo, Indigent Defender Board, by Lewis A. Jones, Tracy L. Oakley, Gina L. Spann, Counsel for Appellant.
Richard Ieyoub, Attorney General, Robert W. Levy, District Attorney, Stephen K. Hearn, Jr., Assistant District Attorney, Counsel for Appellee.
Before BROWN, GASKINS and DREW, JJ.
DREW, J.
After a jury trial, the defendant, Carlos Ray Armstrong, was convicted of second degree murder, a violation of La. R.S. 14:30.1, and sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence. Finding no merit in his appeal, we affirm his conviction and sentence.

FACTS AND PROCEDURAL BACKGROUND
On the evening of September 19, 1997, defendant and the stabbing victim, Stanley Goldsmith, attended a party at the home of Marilyn Slaughter ("Marilyn") on Garr Road in Lincoln Parish, Louisiana where the fatal stabbing occurred. This party lasted into the early morning hours of September 20, 1997. In addition to the defendant and Goldsmith, party attendees included Marilyn; Marilyn's sisters, Carolyn Slaughter ("Carolyn") and Georgia Slaughter[1] ("Georgia"); James Williams ("James"); Dan Williams ("Dan"); and Charles Underwood. Eula Slaughter, the mother of Marilyn, Carolyn and Georgia, was inside the house during the party and did not witness the stabbing.
At an October 1998 jury trial, defendant was found guilty of second degree murder, receiving the statutorily-mandated life sentence, without benefit of parole, probation, or suspension of sentence. After denial of his post-verdict motion for acquittal, as well as his motion for new trial, defendant filed the instant appeal.

TESTIMONY

James Williams' Testimony
James arrived at the party with Underwood. Prior to defendant's arrival, all of the partygoers were hanging around, drinking alcohol and eating fish. James admitted having three 12-ounce beers during the course of the evening. Georgia, defendant's girlfriend, was sitting on the arm of Goldsmith's chair when the defendant arrived. Goldsmith began to "pick" at defendant about some money defendant owed to Goldsmith. The "picking" lasted about 20 minutes, ceased for 20-30 minutes and then started again. Goldsmith walked 20 to 30 feet away from defendant. When James saw defendant *288 grab a knife, he asked the defendant what was wrong. Defendant ran up and stabbed Goldsmith, who was quietly drinking a beer and not agitating the defendant.
Underwood attempted to "stir things up," between the two men. James did not see Goldsmith pull a knife on the defendant nor did he see Marilyn or Underwood give Goldsmith a knife prior to the stabbing incident. After the stabbing, Underwood attempted to wrestle the knife away from defendant, then withdrew from the altercation and helped James put the victim into Carolyn's car. The two men, along with Georgia and Marilyn, took Goldsmith to the emergency room.

Dan Williams' Testimony
Also present at the Slaughter party, Dan (no relation to James) observed defendant and Goldsmith arguing about money Goldsmith claimed defendant owed him. Underwood stirred things up between the two men and gave Goldsmith a knife. Defendant grabbed a knife and went after Goldsmith. Although Dan testified during direct examination that Goldsmith was not armed and not threatening or talking to defendant at the time of the attack, he admitted that defendant and Goldsmith were arguing when stabbing occurred. Goldsmith had fish in his hand and was unable to get his knife out of his pocket in time to protect himself from defendant.

Marilyn Slaughter's Testimony
A resident of the home where the party was being held, Marilyn stated Goldsmith was sitting with defendant's girlfriend when defendant arrived. The two men "had words" about money the defendant owed Goldsmith. Goldsmith had a brick in his hands when he and defendant first discussed the debt. Things calmed down for approximately 20 minutes. Then the defendant got a knife from under the pad of Marilyn's chair and stabbed Goldsmith who was not threatening defendant and did not see the defendant approaching him at the time of the stabbing.
During the earlier discussion concerning the money, Underwood stated he was going to give Goldsmith a knife to stab defendant. Therefore, she gave defendant a knife so it would be a fair fight. When the debt discussion ended, she took the knife from defendant and put it under the pad of her chair where defendant later retrieved the knife and stabbed Goldsmith. Immediately after the stabbing, Underwood jumped on defendant and began to kick and punch him.

Charles Underwood's Testimony
Underwood acknowledged that he and Marilyn were seeing each other at the time of the stabbing and their relationship continued at the time of trial. In Underwood's view, defendant and Goldsmith were not actually arguing about the money, but were simply "clowning" with each other. Underwood never intended for Goldsmith to actually harm the defendant. Underwood did not see Goldsmith armed with either a brick or a knife on the night of the stabbing.
Inside the house, Underwood did not witness the stabbing. When he went into the house, Goldsmith was standing in the yard away from the defendant, was unarmed and was minding his own business. After leaving the bathroom, Underwood came out of the house and saw defendant returning to the house with a knife in his hand. At this moment, the injured Goldsmith was approximately 40 feet away. Underwood jumped on defendant to get the knife away and then accompanied Goldsmith to the hospital.

Carolyn Slaughter's Testimony
In Carolyn's opinion, the defendant and victim discussed but did not argue about a debt. During that time, Marilyn gave defendant a knife, but got it back and placed it under the pad of her chair. Carolyn testified that there was about a 15 to 20-minute lull between the money discussion and the stabbing. Carolyn did see Goldsmith with a brick in his hand earlier in the evening. Immediately before the stabbing, Goldsmith was standing outside the *289 carport and defendant was sitting on the steps under the carport. Goldsmith had nothing in his hands at the time of the stabbing.

Deputy Kenneth Wesley
A detective with the Lincoln Parish Sheriff's Office and the final prosecution witness, Wesley was dispatched at approximately 2:45 a.m. to the scene of the stabbing where witnesses told him the defendant had stabbed Goldsmith. Wesley was unable to locate the defendant for the next 36 hours and was initially unable to find the bloody knife which was later found in some high weeds near a trailer situated behind the house on Garr Road. An open pocketknife, blade down, was found in Goldsmith's pocket by hospital personnel. When arrested, defendant told Wesley that Goldsmith came at him with a pocketknife before he stabbed him.

Georgia Slaughter's Testimony
Admitting to several inconsistencies between her statement to the police on the day of the stabbing and her testimony, Georgia, the first of three defense witnesses, acknowledged she was trying to assist the defendant whom she was dating at the time of the incident. In her version, shortly after 1:00 a.m. on September 20, 1997, the defendant and Goldsmith began "exchanging words." Underwood stirred things up by saying he believed that defendant could whip Goldsmith. Things quieted down for a time and then words started up again over the issue of borrowed money. After defendant told Goldsmith he would pay him back when he got his check, Underwood attempted to start a fight between the two men. Underwood pulled out a knife, which happened to be defendant's pocketknife, and claimed he was going to give it to Goldsmith so Goldsmith could stab defendant with his own knife. Underwood walked over to Goldsmith and gave him something. Her sister Marilyn give defendant a knife.
While asserting that defendant did not want to fight, Georgia ripped his shirt attempting to hold him back from the fight. During the "quiet period," Georgia heard James Williams bet someone else at the party that one (either defendant or Goldsmith) would whip the other. Georgia went into the house for approximately two minutes to use the restroom. When she came back outside, Goldsmith had been stabbed.

Testimony of Defendant, Carlos Ray Armstrong
Defendant admitted the debt to Goldsmith, who was drunk and irrational when he asked defendant for $10 of the money at the party. Underwood encouraged Goldsmith to make defendant pay if he really owed him the money. James Williams bet $5 that defendant could whip Goldsmith. Prior to the stabbing, defendant was ready to fight Goldsmith.
Underwood pulled the defendant's knife out of his pocket and told defendant he was going to give it to Goldsmith to stab defendant with it. Defendant saw Underwood walk over and give the knife to Goldsmith who came at defendant. The victim had the open knife in his right hand with the blade behind a beer can and with a bottle of beer in his left hand. Marilyn gave the defendant a knife with which to defend himself. Defendant swung that knife and pushed Goldsmith away from him. This entire series of events, which resulted in Goldsmith being fatally stabbed, took place under the carport near the steps to the house where the defendant was sitting. Following the stabbing and the pushing, Underwood jumped and began to beat defendant.
Because he thought Goldsmith was trying to kill him with the pocketknife, the defendant swung the knife to protect himself. After the fight, he stayed inside the house on Garr Road and professed ignorance that the police were looking for him at the crime scene. When informed that the police were seeking him, defendant hid the knife by throwing it in bushes behind the house on Garr Road. He walked from the Garr Road house to his home on Liberty *290 Hill. He opined he stood stand a better chance of going to Liberty Hill rather than staying there because there was "no telling" what the police would do if they found him.

Deputy Chad Alexander
The final defense witness took statements from the witnesses at the hospital. Marilyn and Carolyn reported that defendant and Goldsmith who each had a knife were standing away from the crowd by themselves arguing when the stabbing occurred. Underwood's account was that defendant and Goldsmith were fighting when the defendant ran over, got a knife, ran back and stabbed Goldsmith.

Deputy Wesley's Rebuttal
Deputy Wesley described the whereabouts of certain evidence at the crime scene. Wesley recovered a cap, sunglasses, beer can and bloody t-shirt in Marilyn's yard. Wesley observed blood droppings in the yard and on the driveway, but contrary to the defendant's sworn testimony that the stabbing occurred near the steps, Wesley found no physical evidence under the carport.

DISCUSSION

Sufficiency of the Evidence
Assignments of Error # 4 and 5 challenge the sufficiency of the evidence in this matter and suggest that the verdict should either be reversed on the basis of justifiable homicide or at least reduced from second degree murder to manslaughter. When the defendant challenges both the sufficiency of the evidence and one or more trial errors, the reviewing court will first review the sufficiency of the evidence, a finding of evidentiary insufficiency will moot the trial errors. State v. Bullard, 29,662 (La.App.2d Cir.09/24/97), 700 So.2d 1051. The criterion for evaluating sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational fact-trier could find that the state proved all elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Clower, 30,745 (La.App.2d Cir.6/24/98), 715 So.2d 101. That standard, initially enunciated in Jackson and now legislatively embodied within La. C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Smith, 441 So.2d 739 (La. 1983); State v. Clower, supra.
It is always the function of the judge or the jury to assess the credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir. 1992), writ denied, 617 So.2d 905 (La. 1993). Where a trier of fact has made a rational determination, an appellate court should not disturb it. Indeed, in the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for the requisite factual conclusion. State v. Clower, supra.
Second degree murder, pursuant to La. R.S. 14:30.1(A)(1), is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. The defendant argues that he did not murder Goldsmith, but killed him in an act of self-defense. La. R.S. 14:20 provides in pertinent part:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
Manslaughter is a homicide which would be either first degree murder or second degree murder but the offense is committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive a person of his self control or cool reflection. "Sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and *291 cool reflection are not elements of the crime of manslaughter. They are mitigating factors in the nature of a defense, reflecting a degree of culpability less than that present when a homicide is committed without them. La. R.S. 14:31; State v. Arnold, 30,282 (La.App.2d Cir.01/21/98), 706 So.2d 578.
Self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. State v. Arnold, supra; State v. Cotton, 25,940 (La. App.2d Cir.03/30/94), 634 So.2d 937. However, the defendant who asserts self defense in a homicide case does not assume any burden of proof on that issue. The state has the affirmative duty of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense. Thus, the state must show beyond a reasonable doubt that the defendant did not reasonably believe that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save his life. On appeal, the relevant inquiry is whether any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense after viewing the evidence in the light most favorable to the prosecution. State v. Cotton, supra.
The defendant argues that he stabbed the armed and charging Goldsmith in self-defense. The defendant further contends that the testimony of all of the state's eyewitnesses is contradictory when compared to police statements given by these same witnesses to Deputy Chad Alexander on the night of the incident and are thus not credible. The defendant next argues this court should reverse his conviction based on the testimony of Georgia Slaughter, notwithstanding that this witness admitted to previously giving false testimony in order to protect the defendant, her former boyfriend. The defendant finally alleges that, if any crime, this is manslaughter, because Goldsmith was armed and the aggressor, and that the two were having a heated argument immediately prior to the stabbing. However, none of these arguments are supported by the record.
Despite the alleged inconsistencies and the differing observations of the witnesses, the evidence demonstrates as a whole that defendant could not have reasonably believed he was either in imminent danger of death or great physical harm, or that the killing was necessary to save himself from these dangers. The state presented the testimony of Dan, James, Marilyn, Carolyn and Underwood, all of whom testified that they did not see the victim threatening the defendant with a knife immediately before he was stabbed. Further, the testimony of Georgia simply says she saw Underwood with a knife but that she did not know for sure whether he gave it to Goldsmith.
While James stated the "picking" had started again right before the stabbing and Dan gave conflicting testimony about whether or not the two men were arguing when the stabbing occurred, Marilyn, Carolyn and Underwood testified that disagreement had ceased approximately 20 minutes before the stabbing. Georgia also stated there was a quiet period between the debt discussion and the stabbing.
Interestingly, although defense counsel emphasized in brief the brick Goldsmith had during the money discussion, the defendant never mentioned the brick and whether he felt threatened by it. Additionally, defendant never testified that Goldsmith made any threats to him at any time prior to the point in time the defendant claims Goldsmith came at him with a pocketknife. Finally, during the lull period which occurred immediately prior to the stabbing, James and Marilyn testified Goldsmith moved at least 20 feet away from the defendant, all the way over into Marilyn's yard.
The only testimony that portrayed the victim as the aggressor was that of the defendant. He stated Goldsmith came at *292 him with a pocketknife, causing him to fear for his life and compelling him to attempt to defend himself with a knife he got from Marilyn. Clearly, the jury chose to believe the testimony of the eyewitnesses rather than the tale told by the defendant. The jury heard from all of the eyewitnesses that defendant and Goldsmith had discussed money and that defendant was given a knife by people present who thought Goldsmith was armed. After the money discussion ended, Marilyn got her knife from the defendant and peace reigned for 20 minutes, during which time Goldsmith left the carport area and stood in the yard, away from the defendant.
The jury further heard that the defendant, who was sitting on steps under the carport, retrieved the knife from under Marilyn's chair pad and approached Goldsmith, who was neither threatening the defendant nor brandishing a weapon. The jury obviously inferred that the defendant could not have reasonably believed that he was in imminent danger of death or great bodily harm.
All of the physical evidence points towards the stabbing occurring in the yard where Goldsmith was standing, rather than under the carport where the defendant was sitting, further belying defendant's assertion that Goldsmith was the aggressor. This fact scenario does not meet the criteria for self defense. This court should not second guess the jury's decision based upon the testimony of the witnesses. The defendant's claim of justifiable homicide is totally without merit.
The defendant advances the proposition that his conviction should be reduced to manslaughter because this stabbing occurred in the midst of a heated argument. The jury apparently believed the testimony of the witnesses who said that any argument between the defendant and Goldsmith ceased more than 20 minutes prior to defendant stabbing Goldsmith who was some distance away from the defendant and was neither threatening nor taunting the defendant. Additionally, the eyewitnesses agreed that Goldsmith was not brandishing a weapon at the defendant immediately prior to being stabbed. The physical evidence places the event in the yard, where Goldsmith was located, rather than under the carport where the defendant was located.
Sudden passion and heat of blood which distinguish manslaughter from homicide are not elements of the offense but mitigatory factors exhibiting a degree of culpability less than is present when the homicide is committed without them. State v. Tompkins, 403 So.2d 644 (La. 1981), affirmed after remand, 429 So.2d 1385 (La.1982). A defendant who shows by a preponderance of the evidence that these mitigatory factors are present is entitled to the verdict of manslaughter. State v. Lombard, 486 So.2d 106 (La.1986), affirmed after remand, 501 So.2d 889 (La. App. 5th Cir.1987); writ denied, 506 So.2d 504 (La.1987). However, the defendant is not obligated to establish the factors affirmatively; instead, the jury may infer them from the overall evidence presented. The reviewing court's function is to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the state, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, supra.
The jury has great discretion to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). This record clearly supports a finding that defendant's blood should have cooled well prior to his stabbing Goldsmith. This assignment is without merit. Likewise, defendant's assertion of evidentiary insufficiency is without merit.

Mistrial
Assignments of Error # 6 and 7 urge error in the trial court's failure to grant a mistrial (or at least release the *293 "tainted" jurors) after a prospective juror, who was dismissed for cause by the court, made critical comments to six other jurors who were later selected as trial jurors. The incident in question is as follows:
Q. (By Mr. Jones) Mr. Gray, if you didn't think we were picking on your (sic) before, I'm sure you do now. When we walked into the Courtroom, I thought I heard you talking to the other jurorssomething about the questions that we had asked you andyour feelings as to the appropriateness of those questions. Am I wrong oror was that basically the conversation that was taking place?
A. That was it.
Q. Can you tell us what you said?
A. I said that I feel like where I live, my family is none of ya'll's business.
Q. Was there anything else that you said to the others as far as why that might concern you and why you didn't think it was any of our business?
A. Well not necessarily whenever you're in a courtroom and I don't know the gentleman over there that's supposedly on trial but, let's say, suppose you have a murderer over there.
Q. Yes sir.
A. And he knows where you live, what your name is, where your family is, your children, where they live, do you know what kind of feelers he could have out?
Q. And is all of that basically what you were communicating to the other people that were sitting here?
A. That was it. I had a comment to make.
Q. Did you say anything other than that?
A. No.
Q. But everything you just told us is basically what was said?
A. That was it.
The defendant made a motion for a mistrial, pursuant to La.C.Cr.P. art 775, at which time he argued that Mr. Gray had tainted the jury pool by referring to defendant as a murderer in their presence and requested that the trial court either declare a mistrial or excuse the six jurors who heard Gray's comments. The court refused to grant the defendant's motion for mistrial and further refused to excuse the six jurors. The trial court offered (1) to admonish the jurors at issue to disregard Gray's comments or (2) to allow the attorneys to question the jurors regarding the possible influence as a result of their exposure to the comments. Defense counsel declined either offered remedy, noting for the record a desire not to exacerbate the effects of the remarks by bringing the issue to the forefront again.
La.C.Cr.P. art. 775 provides in pertinent part:
Art. 775. Grounds for Mistrial
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial is a drastic remedy which should be declared only when unnecessary prejudice results to the accused. State v. Smith, 430 So.2d 31 (La. 1983). The crux of defendant's argument is that a mistrial should have been granted because of the uncertainty as to what the other six jurors heard or perceived when Gray made his remarks. This court held in State v. Bean, 582 So.2d 947, 953 (La.App. 2d Cir. 1991), writ denied, 586 So.2d 567 (La. 1991):
A mistrial shall be ordered where prejudicial conduct inside or outside the courtroom makes it impossible to obtain a fair trial. La.C.Cr.P. art. 775. It is a drastic remedy and should be declared only when unnecessary prejudice results to the accused. The determination of whether prejudice has resulted lies within the sound discretion of the trial judge. *294 The denial of a mistrial will not be disturbed absent an abuse of discretion. State v. Smith, supra.

It is not clear that Gray called the defendant a murderer when he made his comments to the other six jury members. Instead, it appears, from the record, as well as from the comments of the trial judge in denying the motion for mistrial, that Gray used the word murderer when explaining his remarks to the lawyers and to the court after the other six jury members had been dismissed by the court.
There is no evidence that the trial court abused its discretion in failing to grant a mistrial or in failing to dismiss the six jurors who heard Gray's unfortunate comment. Further, the defendant refused the court's offer of an admonition, or of a chance to further voir dire on this point. This assignment of error lacks merit.

Excessiveness of Sentence
Defendant's Assignment of Errors # 1-3 challenge the excessiveness of his sentence and the failure of the trial court to consider the La.C.Cr.P. art. 894.1 guidelines, specifically its mitigating factors at sentencing. However, the defendant failed to file a motion to reconsider sentence in this matter. Thus, our review of his sentence is limited to the bare claim that the sentence is constitutionally excessive. La.C.Cr.P. art. 881.1; State v. Mims, 619 So.2d 1059 (La.1993).
It is the legislature's prerogative to determine the length of the sentence imposed for the crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. State v. Dorthey, 623 So.2d 1276 (La.1993). The decision to assess mandatory life sentences is within the prerogative of the legislature. State v. Parker, 416 So.2d 545 (La.1982). The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been rejected. State v. Parker, supra; State v. Brooks, 350 So.2d 1174 (La.1977). The mandatory sentence imposed in this matter is not constitutionally excessive.
Failing to articulate reasons for the sentence as set forth in La.C.Cr.P. art. 894.1 when imposing a mandatory life sentence is not an error because setting forth the factors would be an exercise in futility since the court has no discretion. State v. Williams, 445 So.2d 1264 (La.App. 3rd Cir.1984), writ denied, 449 So.2d 1346 (La.1984). Any articulation by the trial court would have made no difference in the mandatory sentence imposed. However, the trial judge did articulate reasons in accordance with La.C.Cr.P. art 894.1 during the sentencing hearing:
However, for the record, the Court will state the following. With respect to the statement of fact, thethethis, of course, has been a jury trial. The testimony at that trial should be made a part of this hearing as far as the statement of fact is concerned. The testimony establishedeveryone acknowledged that this defendant did stab in the chest the victim in this matter, one Standard Goldsmith, and that stabbing resulted in the death of Standard Goldsmith. The sole factual issue of any significance was whether or not the defendant acted in self-defense. The Court has addressed post-trial motion filed by the defense and the Court's remarks with respect thereto are also made a part of this hearing. The Court was of the opinion that the defendant did not act in self-defense as accepted by the jury in this matter. Now with respect to the sentencing considerations, under Article 894.1, the Court finds that there is an undue risk that during a period of suspended sentence or probation that the defendant will commit another crime. The defendant is in need of correctional treatment or custodial environment that can be provided most effectively by his commitment to an institution and a lesser sentence would deprecate the seriousness of-of-of defendant's crime. The *295 court also finds the following aggravating circumstances. The offender's conduct during the commission of the offense did manifest a deliberate cruelty to the victim. The victim (sic) used actual violence in the commission of the offense. The offense resulted in significant personal injury and/or economic loss to the victim and/or his family. Obviously, it resulted in death. The offender used a dangerous weapon, i.e. a knife in the commission of the offense. Those are the aggravating circumstances. The Court, though I don't believe the Court is required to recite its reasons for judgment given the fact that this is a mandatory sentence, those are the reasons that the Court will give at this time.
Thus, the trial judge adequately complied with the sentencing requirements of the Code of Criminal Procedure.

No Pre-sentence Report
Defendant's Assignment of Error # 8 contends that the trial court erred in failing to order a pre-sentence investigation report in order to obtain more information from collateral sources about defendant and thus make a fully informed decision regarding defendant's sentence in this matter. A pre-sentence investigation may be ordered by the court but is not a right of the accused and is not mandatory. La.C.Cr.P. art. 875; State v. Wimberly, 414 So.2d 666 (La.1982); State v. Alexander, 97-169 (La.App. 3rd Cir.06/04/97), 696 So.2d 171, writ denied, 97-1803 (La.12/12/97), 704 So.2d 1199.
In the instant matter, the record does not reflect that defendant requested that a pre-sentence investigation be conducted prior to the date of sentencing, nor was any objection made at the time of sentencing. The pre-sentence investigation would not have abrogated the legal obligation of the judge to impose the mandatory sentence.

Credit For Time Served
Assignment of Error # 9 is that the court failed to award him credit for time served. La.C.Cr.P. art. 880. However, the 1997 amendment to La.C.Cr.P. art. 880 is designed to make credit for prior custody self-operating even on a silent record. State v. Ignot, 29,745 (La. App.2d Cir.09/24/97), 701 So.2d 1001, writ denied, 99-0336 (La.6/18/99), 745 So.2d 618. Thus, there is no need for this court to remand this matter for an amendment to the minutes to reflect credit for time served as is suggested by the defendant. This assignment is without merit.

Lack of Delay Before Sentence
The defendant filed a motion for new trial, which the trial court heard and denied on October 30, 1998. Immediately after this denial, the trial court sentenced the defendant to life imprisonment. The defense urges that the trial judge committed reversible error by failing to observe the 24 hours mandated by La.C.Cr.P, art. 873, between denial of the motion for new trial and imposition of sentence. Since this was a mandatory life sentence, no prejudice resulted from the failure of the court to comply with the delay. Absent a showing that prejudice resulted from the failure to observe the statutory delay, this is at most harmless error, and reversal of the prematurely imposed sentence is not required. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). This assignment lacks merit.

DECREE
The conviction and the sentence are AFFIRMED.
NOTES
[1] Georgia Slaughter is also referred to throughout the trial transcript by her nick-name "Nicki."