821 So.2d 678 (2002)
STATE of Louisiana, Appellee
v.
Byron Rozell NASH, Appellant.
No. 36,038-KA.
Court of Appeal of Louisiana, Second Circuit.
June 14, 2002.
*680 J. Wilson Rambo, Louisiana Appellate Project, Monroe, for Appellant.
Richard Ieyoub, Attorney General, Robert W. Levy, District Attorney, Clifford R. Strider, III, Assistant District Attorney, for Appellee.
Before STEWART, GASKINS and DREW, JJ.
GASKINS, J.
Following a jury trial, the defendant, Byron Rozell Nash, was convicted of second degree murder. He received the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence. He appeals his conviction and sentence. We affirm.

FACTS
On the night of May 30, 1999, the partially-dressed body of 28-year-old Beverly Morgan was found in the trailer in which she had been living on Dunn Road, near Grambling, Louisiana. She was lying in a pool of blood on the kitchen floor. She had suffered numerous stab and slash wounds, many of them defensive wounds. The victim also had a large number of abrasions and contusions. Extensive injuries were present in the head area. The cord of a clock/radio was wrapped around the victim's neck. She had been killed by a slash wound to the neck that cut through her jugular vein and her larynx.
The trailer showed evidence of a violent and bloody fight between the victim and her attacker. Among other clues, the police discovered bloody boot prints in the carpet. Forensic examination revealed the defendant's bloody fingerprints on a metal folding chair with which the victim had apparently been struck several times. The defendant's DNA was also found in the bloodstains on the chair, commingled with that of the victim. Additionally, the defendant's bloody palm prints were found on a bamboo cane that also had blood and tissue on one end.
On June 25, 1999, law enforcement investigators questioned the defendant. Initially the defendant denied knowing the victim. He said that he had heard of her but the only residence on Dunn Road he had been inside belonged to a relative. Confronted with information that he had been in another Dunn Road residence, the defendant asserted that he had been in a friend's trailer the year before. When the police told him that they had information that he had been in the victim's trailer, he stated that he knew a prior occupant of the residence. When the police indicated that they knew he had been in the victim's trailer shortly before the victim's death, the defendant stated that he had been there two weeks prior to the murder to see the victim. (However, the victim was not living there two weeks before her death.) The defendant stated that he and the victim had sexual relations and that it was the last time he was in the residence. The investigators then informed the defendant that his bloody fingerprint placed him at the murder scene. However, the officers did not tell him exactly where in the trailer they found the fingerprint. The defendant then admitted that after his wife went to bed on the night of May 29th, he went to the victim's trailer. He stated that when the victim failed to answer his knock on the front door, he entered the trailer through an open back door and found the victim. She did not respond when he shook her, and he then fled out the back door. After the officers told him that the fingerprint was found on a chair, the defendant said he might have touched a chair but he did not say why. He indicated that a chair was the only thing he might have touched. He told the investigators that he was wearing tennis shoes that night.
*681 The defendant was arrested and charged with second degree murder. The police executed a search warrant at the defendant's home. They recovered a pair of Timberland boots. Examination of the boots indicated that they were consistent with the ones that created the bloody footprints at the murder scene; however, a positive identification could not be made.
In August 2001, the defendant was tried before a jury. His wife testified that on the night of May 29, 1999, she and the defendant returned home at 2 a.m. from an evening out. Although she went to bed, the defendant left their home twice. The first time he was gone for about 25 minutes; the second time he was gone for between an hour and 90 minutes. When the defendant returned the second time, she heard him knock on the back door. She unlocked the door. The defendant had blood on his face, hands and clothing. The pants he was wearing did not belong to him. He showered and put the clothes he was wearing in a bag. The next day, Mrs. Nash was present when the defendant threw the bloody clothing, including his Timberland boots, off a bridge into a body of water. According to her testimony, the defendant had two identical pairs of Timberland bootsthe pair discarded from the bridge and the pair seized by the police.
A unanimous jury convicted the defendant of second degree murder. His motions for new trial and post verdict judgment of acquittal were denied. In September 2001, the trial court imposed the mandatory sentence of life imprisonment without benefits. In so doing, the trial court specifically found that the sentence was appropriate for the brutal and "heinous" murder committed by the defendant.
The defendant appealed. Defense counsel asserted four assignments of error, which present two basic arguments for review. The defendant filed five pro se supplemental assignments of error, which present three arguments.

SUFFICIENCY OF EVIDENCE
In three assignments of error filed by defense counsel, the defendant contests the sufficiency of the evidence presented to convict him of second degree murder. He argues that the evidence was circumstantial regarding his identity as the murderer and did not exclude every reasonable hypothesis of innocence.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992); La. C.Cr.P. art. 821.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d *682 471 (La.1983); State v. Williams, 33,201 (La.App.2d Cir.5/15/00), 758 So.2d 1003, writ denied, XXXX-XXXX (La.4/27/01), 791 So.2d 111.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const., art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).
The evidence presented at trial demonstrates that the defendant was in the victim's home on the night she was murdered. His bloody fingerprints and palm prints were found on a metal folding chair and a bamboo pole, both of which apparently came into contact with the blood-drenched victim. In his statement to the police, the defendant attempted to explain away his presence at the murder scene; however, his responses were frequently untruthful and were obviously tailored to satisfy the information as gradually revealed by the investigating officers. Initially he denied even knowing the victim; eventually he admitted that he had engaged in sexual relations with her on at least one occasion. After first denying that he had ever been in the trailer where the victim died, he finally admitted having been there but at time prior to the murder. When confronted with the fact that he had been there on the night of the murder, the defendant claimed to have discovered the already-dead victim. As to his fingerprints at the crime scene, he stated that he might have touched the chair. However, he gave no explanation of why he would have touched the chair. He stated that he did not touch any other object; thus, he offered no explanation for his palm prints on the bamboo pole. Furthermore, the defendant's DNA was found on the metal chair, mixed with that of the victim. The state's expert witness testified that the defendant's DNA came to be present in such a fashion by means of a bodily fluid, most likely his blood. This is particularly relevant in view of the evidence in the trailer of a protracted and violent struggle between the victim and her killer. The defendant's statement to the police offered no explanation as to why his blood would have commingled with that of the victim if he merely discovered the body.
Furthermore, the state offered the testimony of the defendant's wife.[1] She testified that the defendant left home for at least an hour on the night before the victim's body was found and that he returned with blood on his face, hands and clothing. The following day he disposed of his bloody clothing, which included boots similar to those which left bloody prints at the murder scene.
After a thorough review of the record, we are convinced the evidence presented at trialviewed in the light most favorable to the stateproved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of the offense of second degree murder and the defendant's identity as the perpetrator of the offense. These assignments of error are meritless.

EXCESSIVE SENTENCE
In defense counsel's remaining assignment of error, the defendant contends *683 that the trial court imposed an excessive sentence.
The defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1. This statute imposes a mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. It is the legislature's prerogative to determine the length of a sentence imposed for the crimes classified as felonies, and the courts are charged with applying those punishments unless they are found to be unconstitutional. State v. Armstrong, 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, 99-3151 (La.4/7/00), 759 So.2d 92. The decision to assess mandatory life sentences is within the authority of the legislature. State v. Armstrong, supra. Moreover, the judiciary should afford great deference to the legislature's determination of an appropriate minimum sentence. State v. Ruffins, 32,870 (La.App.2d Cir.12/10/99), 748 So.2d 614. The argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); Ruffins, supra; Armstrong, supra; State v. Davis, 31,711 (La.App.2d Cir. 3/31/99), 732 So.2d 612, writ denied, 99-3114 (La.5/5/00), 761 So.2d 539.
Additionally, the defendant has failed to show by clear and convincing evidence that his particular circumstances are an exception to the constitutional application of this mandatory sentence. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. The sentence of life imprisonment without benefit of parole, probation, or suspension of sentence in the present case does not shock our sense of justice in view of the heinous and brutal nature of the defendant's crime.
This assignment of error is without merit.

SPOUSAL PRIVILEGE
In a pro se assignment of error, the defendant argues that the trial court erred in allowing his wife to testify against him. He argues that she should not have been permitted to testify as to facts and information she received through confidential communications with her husband.
La. C.E. art. 504(B), establishing the spousal privilege to confidential communications, provides as follows:
Each spouse has a privilege during and after the marriage to refuse to disclose, and to prevent the other spouse from disclosing, confidential communications with the other spouse while they were husband and wife.
Under La. C.E. art. 504(A), a communication is defined as "confidential" if "it is made privately and is not intended for further disclosure unless such disclosure is itself privileged."
La. C.E. art. 505 states:
In a criminal case or in commitment or interdiction proceedings, a witness spouse has a privilege not to testify against the other spouse. This privilege terminates upon the annulment of the marriage, legal separation, or divorce of the spouses.
The spousal witness privilege set forth in La. C.E. art. 505 is held by the witness spouse and can be waived by her. The statute provides that neither spouse may be compelled to be a witness against the other in a criminal trial. However, the statute does not prohibit a spouse from voluntarily taking the stand against the defendant spouse. State v. Taylor, 94-0696 *684 (La.9/6/94), 642 So.2d 160. If a spouse waives the right to testimonial privilege, the waiver gives the spouse the right to testify against the other spouse as to non-privileged evidence. State v. Bennett, 357 So.2d 1136 (La.1978); State v. Sarrio, 01-543 (La.App. 5th Cir.11/27/01), 803 So.2d 212.
The trial court carefully delineated the perimeters of Mrs. Nash's testimony. Contrary to the defendant's assertions in brief, his wife was not permitted to testify about information she received through "confidential communications." Instead, her testimony was restricted to things that she observed, not what she had been told confidentially by her husband. The defendant's right under La. C.E. art. 504 to spousal privilege pertaining to confidential communications was upheld. However, Mrs. Nash chose to waive her spousal privilege under La. C.E. art. 505 to not testify against her husband. She was thus allowed to testify as to non-privileged matters.
This assignment of error is meritless.

JURORS' NOTES
In another pro se assignment of error, the defendant complains that the jurors were allowed to take notes during his trial "without proper instructions."
La.C.Cr.P. art. 793 states in pertinent part:
B. A juror shall be permitted to take notes when agreement to granting such permission has been made between the defendant and the state in open court but not within the presence of the jury. The court shall provide the needed writing implements. Jurors may, but need not, take notes and such notes may be used during the jury's deliberations but shall not be preserved for review on appeal. The trial judge shall ensure the confidentiality of the notes during the course of trial and the jury's deliberation and shall cause the notes to be destroyed immediately upon return of the verdict.
Prior to the commencement of trial, the trial court stated on the recordand outside of the jury's presencethat the attorneys had "discussed and agreed that the [j]urors will be allowed to take notes under the procedure that we discussed with the tablets which will be kept in my office at any breaks or overnight. Is that agreeable, gentlemen?" Both the prosecutor and defense counsel responded affirmatively.
No contemporaneous objection was made by the defendant to the jurors taking notes. To the contrary, the record shows that both the state and the defense agreed to that action as required under La. C.Cr.P. art. 793; they also agreed to the procedure. Due to the lack of any objection, the issue is not properly before this court. La.C.Cr.P. art. 841. Furthermore, the defendant does not project any example of how he was prejudiced by the jurors taking notes.
This assignment of error lacks merit.

INEFFECTIVE COUNSEL
In three pro se assignments of error, the defendant contends that his trial counsel was ineffective. Specifically, he contends that trial counsel was deficient in the following ways: he failed to ensure that a DNA expert was available to testify on the defendant's behalf at trial; he had a conflict of interest because he was a member of the state legislature seeking reelection and his father was a local justice of the peace; and he failed to object to allegedly "inadmissible" expert evidence presented by the state.
A claim of ineffective assistance of counsel is most appropriately addressed *685 through an application for postconviction relief rather than direct appeal, so as to afford the parties an adequate record for review. State v. Truitt, 500 So.2d 355 (La.1987); State v. McIntyre, 97-876 (La.App. 5th Cir.1/27/98), 708 So.2d 1071, writ denied, 98-1032 (La.9/18/98), 724 So.2d 753. Only when the record contains sufficient evidence to decide the issue and the issue is properly raised by assignment of error on appeal, may it be addressed in the interest of judicial economy. State v. Peart, 621 So.2d 780 (La.1993); State v. McIntyre, supra.
Evidence of the defendant's allegations is not apparent in the record. Consequently, the defendant's ineffective counsel claims are reserved for post-conviction relief and an evidentiary hearing, upon pertinent application, in the district court.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The defendant's pro se assignment of error about spousal privilege and the propriety of his wife's testimony will be dealt with infra.