h STEWART, J.
The defendant, Donald Ray Lemons (“Lemons”), was convicted of second degree murder, and sentenced to life imprisonment, without benefit of probation, parole or suspension of sentence, from which *505 he now appeals. For the reasons that follow, we affirm the defendant’s conviction and sentence.
FACTS
Lemons was married to, but separated from the victim, Linda Winston (“Winston”). On October 23, 2000, Winston arrived at her office in downtown Monroe, shortly before 7:00 a.m. Bruce Williams (‘Williams”) worked at the building. Shortly after Winston entered the building, Lemons arrived. He visited briefly with Williams, who knew him because they had been incarcerated together, and then went to Winston’s office. Lemons hid a long kitchen knife with a serrated edge in his jacket.
Williams testified that Lemons did not stay in Winston’s office long. He recalled that he was smoking a cigarette when Lemons came into the building, and he was still smoking the same cigarette when Lemons hurriedly left Winston’s office. He also noticed a wet stain on the defendant’s clothing. At the same time, Williams heard a lady scream. He then rushed to Winston’s office where he found her lying on the floor, bleeding profusely. She had been stabbed 12 times. Winston attempted unsuccessfully to speak to Williams, and she died before help could arrive.
The police were called to the scene, and they began to search for the defendant. At about 8:00 a.m., Bill Webb, a detective with the Monroe Police Department, received a phone call from the defendant, who told him |2that he thought “... he had just killed his wife.” Lemons also told Detective Webb where the murder weapon was hidden. Lemons then stated that he wanted to turn himself in and told Detective Webb where he wanted to meet. Detective Webb went and found the knife exactly where the defendant stated that he had hidden it. Detective Webb and another Monroe Police officer went to the location where he had arranged to meet Lemons who turned himself in, and was verbally advised of his rights.
The defendant was taken to the police station, where he was again advised of his Miranda rights. He signed a rights waiver form and gave the officers a recorded statement. He stated that he and Winston were having problems and were separated. He stated that as he was walking to go visit Winston he found a knife, about 12 inches long, on the ground. He stuck the knife in the waistband of his pants. But, before he went across a bridge, he put the knife down on a bridge railing. When asked why he put the knife down, the defendant stated, “[l]ike I stated I laid the knife on the bridge and I said if this knife is here when I get back I don’t want to do this cause I just want to talk to her. I came back and I was drinking a beer. I got back there ... picked the knife up.”
Lemons stated that he then walked to Winston’s office with the knife hidden in his pants. He waited for her outside. After she drove up, he spoke to her, then followed her into the building and her office. Lemons stated that he was upset because he believed that Winston was having an affair. As they argued, Lemons grabbed Winston and turned her around. He only recalled stabbing her once in the neck. He watched her fall to the |afloor bleeding, then left the building. After talking to relatives on the phone, Lemons called the police to turn himself in.
Lemons was originally charged with manslaughter. On January 17, 2001, the state amended the charge to second degree murder. He entered a plea of not guilty by reason of insanity. On June 1, 2001, the defendant filed an “Application for Appointment of a Sanity Commission.” *506 The trial court appointed a sanity commission, which examined the defendant.
On August 6, 2002, a hearing was held on the defendant’s motion to suppress his statement and to determine if he was competent to assist .counsel and capable to stand trial. The parties stipulated to the doctors’ reports. The debate was whether the defendant needed psychiatric help following his military tour of duty where he had to kill several people. Some of the medical experts felt that the defendant may be suffering from post-traumatic stress disorder, but they did not feel that it was sufficient for the defendant not to have been able to distinguish right from wrong when he committed the murder.
The trial court found that the defendant had not cooperated with the sanity commission and had not given it much, if any, substance to base a very definitive opinion on the defendant’s mental state. The trial court found the majority of the four medical reports concluded that the defendant was able to distinguish right from wrong at the time of the offense, and that he was able to assist counsel at the trial. After hearing testimony about the taking of the defendant’s statement, the trial court also found the 14defendant’s statement to the police was freely and voluntarily made, after being fully advised of his rights.
The defendant was tried before a jury. The state’s witnesses consisted of Bruce Williams, who testified about what he saw and heard the morning Ms. Winston was murdered; and four police officers, Larry Ludlow, William C. Webb, Paul Harper and Mark Nappier, who testified about their investigation of the crime and the statement by the defendant admitting to the crime. Dr. Stephen Cogswell, M.D. testified about performing the autopsy of Ms. Winston, and establishing that she had been stabbed 12 times in the neck, chest, back, abdomen and arms. He further testified that 3 of the stab wounds were fatal wounds. The fatal wounds were: a stab wound in the neck, cutting the carotid artery, a stab wound into the chest, cutting the pulmonary artery, and a stab wound into a kidney. Dr. Cogswell estimated that Ms. Winston could have survived only minutes after receiving those wounds.
After the state rested its case, the defendant’s counsel, outside the presence of the jury, stated to the trial court that the defendant wanted to abandon and withdraw his plea of not guilty by reason of insanity. The trial court questioned the defendant and his counsel to confirm that the defendant fully understood the significance of abandoning this defense. When the jury returned to the courtroom, the defendant’s counsel stated to the trial court that the defense rested, without adducing any evidence, and that the defendant was abandoning his defense of not guilty by reason of insanity.
| sAfter being read the instructions, the jury deliberated and announced a verdict of guilty as charged. When the jury was polled, the vote was nine for guilty as charged. Three jurors stated that was not their verdict. The trial court gave the jurors a new verdict form and sent them back to deliberate further. The defendant moved for a mistrial, asserting that one juror had assisted another in completing the polling form. The trial court denied the motion. The jury had been out for six minutes and returned with a verdict of second degree murder. The polling for this verdict was 10 for guilty as charged and 2 against. The defendant again moved for mistrial, asserting that the jury had not been out long enough to deliberate. This motion was denied. The trial court ordered a pre-sentence investigation report.
At sentencing, the defendant’s counsel argued that the life sentence was excessive *507 in light of evidence of “some degree of provocation” and “great evidence of mental instability.” The trial court rejected the defendant’s argument and sentenced the defendant to life imprisonment, without benefit of probation, parole or suspension of sentence. This appeal followed.
DISCUSSION

Sufficiency of Evidence

Lemons argues that the evidence presented was insufficient to convict him of second degree murder, and at best, his actions amounted to manslaughter.
 La. R.S. 14:30.1(A)(1) provides: |fiA. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
La. R.S. 14:31(A)(1) provides:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
Lemons argues that, when he stabbed his wife 12 times, he acted in immediate, sudden passion or heat of blood because she provoked him. The defendant argues his statements to the police are evidence supporting a finding that he committed the lesser crime of manslaughter rather than second degree murder.
“Sudden passion” and “heat of blood” have been found not to be separate elements of the offense, but are mitigating factors that may show less culpability than when a homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986). Provocation is a question of fact to be determined by the trier of fact. In order to be entitled to the lesser verdict of manslaughter, a defendant is required to prove mitigatory factors by a preponderance of the evidence. State v. Mackens, 35,350 (La.App.2d Cir.12/28/01), 803 So.2d 454; State v. Lombard, supra.
Winston was unarmed when the defendant went into her office and began stabbing her with a kitchen knife. Lemons claims that he was |7provoked when the victim began to berate him. However, the only evidence to support that the victim said or did anything to provoke the defendant was the defendant’s own statement to police investigators. It is noteworthy that Bruce Williams, who was outside of the victim’s office at the time of the murder, did not testify about hearing or seeing anything unusual while Lemons was in Winston’s office. His testimony established that the defendant waited outside the victim’s workplace for at least 20 to 30 minutes until she arrived, followed her into her office, and almost immediately began stabbing her. It is also noteworthy that despite the defendant’s argument that he was upset and suffering from mental instability, Williams testified that the defendant stopped and spoke to him as he entered the building. Williams did not notice anything unusual about the defendant’s demeanor other than the defendant was not neatly dressed, but was dressed in what appeared to be work clothes. Provided with this evidence and the evidence that the defendant followed, confronted, then stabbed his victim 12 times in less than a couple of minutes, the jury was free to *508 draw its own conclusion and disregard defendant’s statements as evidence of any mitigation of defendant’s conduct.
Even if the jury determined that the victim did insult and berate the defendant, it could reasonably conclude that the victim’s actions were not sufficient to mitigate defendant’s action from second degree murder to manslaughter. Provocative acts held to rise to the level of mitigating conduct have involved physical threats or actions on the part of the victim. See State v. Lombard, supra, and State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.1987), writs denied, 508 So.2d 64 (1987) and 508 So.2d 65 (La.1987). Moreover, our courts have not derogated from the principle that “mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter.” State v. Massey, 535 So.2d 1135 (La.App. 2d Cir.1988); State v. Conerly, 48 La. Ann. 1561, 21 So. 192 (La.1896). Considering the totality of the record before this court, a rational trier of fact could have concluded that the defendant did not establish the mitigating factors for manslaughter, reasonableness of provocation and heat of blood, by a preponderance of the evidence.
The next inquiry is whether the evidence establishes that a reasonable trier of fact could have concluded that the defendant had the requisite intent to commit second degree murder.
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993).
In this case, Dr. Cogswell testified extensively about the victim’s wounds. He found three lethal wounds. Her throat was cut several times, ^including one cut that severed her carotid artery. She was stabbed several times in the chest, including one stab in the heart area which severed her pulmonary artery. Lastly, she was stabbed in a kidney. She was also stabbed in the arms, indicating a futile attempt to defend herself. Due to the number of stab wounds, together with the serious nature of the wounds, a reasonable jury could have found that the defendant had the specific intent to kill or inflict great bodily harm upon his wife, without provocation, when he stabbed her. This assignment is therefore without merit.

Excessive Sentence

Lemons argues that although the life sentence is statutorily correct, it is unconstitutionally excessive because he suffers from some form of mental illness, possibly post traumatic stress disorder, which confused his moral perspective and made it difficult for him to distinguish between right and wrong.
The state argues the sentence is statutorily mandated and the argument that it is constitutionally excessive has been repeatedly rejected.
La. R.S. 14:30.1(B) provides:
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
The defendant was convicted of second degree murder, a violation of La. *509 R.S. 14:30.1, which carries a mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. It is within the legislature’s authority to determine the length of the sentence imposed for crimes classified as felonies, and the courts are Uncharged with applying these punishments unless they are found to be unconstitutional. State v. Armstrong, 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, 1999-3151 (La.4/7/00), 759 So.2d 92. The decision to assess mandatory life sentences is within the prerogative of the legislature. State v. Armstrong, supra. The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Clem, 33,686 (La.App.2d Cir.11/1/00), 779 So.2d 763; State v. Ruffins, 32,870 (La.App.2d Cir.12/10/99), 748 So.2d 614; State v. Armstrong, supra; State v. Davis, 31,-711 (La.App.2d Cir.3/31/99), 732 So.2d 612, unit denied, 99-3114 (La.5/5/00), 761 So.2d 539.
In addition, the defendant has failed to show by clear and convincing evidence that his particular circumstances are an exception to the constitutional application of this mandatory sentence. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. In brief, the defendant argues that the life sentence is unconstitutionally excessive because he suffers from some form of mental illness, possibly post traumatic stress disorder, and this condition confused his moral perspective making it difficult for him to distinguish between right and wrong. However, we note that the defendant chose to abandon his defense of not guilty by reason of insanity during the trial. Moreover, the trial court, reviewing the same medical evidence argued on appeal, found the defendant to have been able to distinguish between right and wrong when he committed the murder. Even considering the defendant’s history of possible mental instability, a sentence of life |imprisonment without benefit of parole, probation, or suspension of sentence in the present case does not shock the sense of justice in light of the crime committed and the likely risk of harm to others by the defendant. This assignment is therefore without merit.
CONCLUSION
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.