416 So.2d 545 (1982)
STATE of Louisiana
v.
Charles Richard PARKER.
No. 81-KA-2734.
Supreme Court of Louisiana.
June 21, 1982.
*547 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Marion B. Farmer, Dist. Atty., Abbott J. Reeves, Herbert R. Alexander, Peter J. Garcia, Asst. Dist. Attys., for plaintiff-appellee.
Julian J. Rodrique, Covington, for defendant-appellant.
H. CHARLES GAUDIN, Justice Pro Tem.[*]
Charles Richard Parker, also known as Richard Parker, was charged by grand jury indictment with second degree murder in violation of LSA-R.S. 14:30.1. He entered pleas of not guilty and not guilty by reason of insanity.
On June 10, 1981, following a three-day trial, he was found guilty as charged by an 11-1 jury verdict, and sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
He has appealed his conviction and sentence, asserting 11 assignments of error.

FACTS
During the early morning hours of November 2, 1980, defendant was playing poker at Dave's Bar in Bush, Louisiana, with his brother, Maurice "Scotty" Parker Jr.; his father, Maurice Parker Sr.; and two others, Dwight Jones and Louis "Johnny" Fitzmorris.
Scotty, a paraplegic because of wounds received in a previous gun battle, was seated in a wheelchair at the card table.
An argument broke out between Richard and Fitzmorris over a suggestion that defendant was cheating. Scotty intervened, grabbing Richard with his left hand and striking him in the mouth with his right. The blow bloodied defendant's mouth and loosened several teeth.
Richard pulled a .38 caliber Smith and Wesson pistol from his right boot and fired several shots into the floor, after which defendant and Scotty were involved in an altercation and Scotty's wheelchair was tipped over. Richard left the poker room, returning in approximately 10 minutes.[1]
Defendant's father described what happened next:

*548 "They commenced arguing then Richard says ... `Boy, look what you have done to my mouth,' he says, `as much money as I have spent on you' ... Scotty said, `why don't you shoot me?' ... And he also said, `Just blow my brains out.'"
Richard then shot Scotty in the face three times, killing him.

ASSIGNMENT OF ERROR NO. 1
By this first assignment of error, defendant contends that the trial court erred in limiting the scope of the voir dire examination.
Counsel for defendant, attempting to tell prospective jurors about how Scotty had become a paraplegic, said:
"By the way, his brother was a paraplegic. This will come out in the evidence. His brother had become a paraplegic several months before because of another gun battle that..."
The State objected at this point and the trial court sustained the objection.
In State v. Murray, 375 So.2d 80 (La. 1979), cited favorably in State v. Robinson, 404 So.2d 907 (La.1981), this Court stated:
"Voir dire examination is designed to test the competency and inpartiality of prospective jurors and may not serve to pry into their opinions concerning evidence to be offered at trial."
Further,
"It is well established that the scope of the voir dire examination is within the sound discretion of the trial judge and his rulings thereon will not be disturbed in the absence of a clear abuse of discretion."
We find no abuse of discretion, and note that defense counsel was otherwise afforded wide latitude in questioning jurors regarding their competency and impartiality.
Also, in his opening argument, defense counsel spoke at length of Scotty's violent propensities and the cause of his paralysis.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 2
Defendant argues that the trial judge should have ordered a mistrial after the prosecutor asked this question:
"Mr. Fitzmorris, have you ever heard Richard Parker's reputation discussed in the community?"
Evidence of bad character can be introduced only in rebuttal of testimony showing good character,[2] and defendant had made no effort to establish his good character. Defense counsel objected to the question and requested a mistrial.
The trial judge sustained the objection and was prepared to admonish the jury "... to disregard the question as if it was never asked."
Defense counsel, however, wanted a mistrial not an admonition because the latter only "... gives the jury the impression we are trying to hide something from them..."
The trial judge would not declare a mistrial, and said to defense counsel that "... since you have requested the Court not to admonish the jury, the Court will accede to that request..."
While the inquiry concerning Richard's reputation was improper, the question was not answered; and we cannot conclude either (1) that the trial judge abused his discretion in denying the motion for a mistrial and agreeing to admonish the jury or (2) that merely because the question was asked that defendant was prejudiced to the extent that he did not receive a fair trial.
The trial court's ruling on a motion for a mistrial must reflect an abuse of its discretion before it will be disturbed on appeal. State v. Douglas, 389 So.2d 1263 (La.1980).
Here, we find no abuse.

ASSIGNMENT OF ERROR NO. 3
Defendant objected to the introduction of four photographs, contending they were inflammatory, gruesome, prejudicial *549 and redundant, especially since there was no question as to the identity of the victim and the fact that the defendant killed him.
The photographs, three and one-half inches by three and one-half inches each, show Scotty slumped over in his wheelchair. They also show the card table, the smallness of the room in which the game took place and the arrangement of the chairs, and thus substantiate the testimony of prosecution witnesses.
The photographs are not particularly inflammatory or gruesome, in our judgment, even though they do show the bullet wounds, and trial judge did not abuse his discretion when he decided that their probative value outweighed any possible prejudicial effect.

ASSIGNMENT OF ERROR NO. 4
It is asserted in this assignment that the trial judge erred by allowing the State to introduce oral statements made by the defendant after the prosecution denied (1) the existence of any such statements and (2) that it intended to offer any such statements into evidence.
The defendant filed a motion for discovery and inspection and thereby asked for "... any oral confession or statement of any nature made by the defendant which the District Attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made."
Also, the defendant requested "... any oral statement which the State intends to offer in evidence made by the defendant, whether before or after arrest, in response to interrogation by any person then known to the defendant to be a law enforcement officer..."
These requests track the wording of LSA-C.Cr.P. Art. 716. In response, the State said:
"We have none at this time."
At trial, in rebuttal of defendant's intoxication defense, the State produced an arresting police officer to testify about the defendant's condition and state of mind while being booked at the Covington jail at approximately 5 a. m. The shooting had occurred between 3 and 4 a. m., according to the defendant's father.
The prosecutor argued that at the time the response was made to the motion for discovery and inspection, he was unaware of the intoxication defense and did not intend to offer as evidence any colloquy between the booking officers and the defendant.
Further, the State contended that the conversation was not a part of any police interrogation, and that the statements of the defendant were neither inculpatory nor exculpatory.
Referring to the booking conversation, the prosecuting attorney said:
"... we did not intend to use those at the time, because we did not think there was any relevance to them, and could see no genuine purpose for bringing this information out."
He said that the State did not know of the intoxication defense "... until we were brought into court yesterday, and during opening statements were informed that there was going to be a defense of intoxication..."
The trial judge ruled the conversion admissible, and the officer described how the defendant had quickly and accurately counted out the sum of $2,289.00 he had on his person.
In making his ruling, the trial judge said, "... First of all, there was no interrogation..."
Further:
"At the time this was answered, the intoxication was not a defense, and it was not relevant at the time. It would fit under the broad category of statements of any nature, which this Court doubts very seriously. The Court does not feel like the Legislature would put this type of burden on the State..."
We conclude, as did the trial judge, that the State was not bound to include the booking utterances in response to the motion for discovery and inspection because:
*550 (1) That at the time the answer to the motion for discovery and inspection was prepared, the State did not intend to use this evidence at trial; and
(2) The statements by defendant while being booked were not in response to police interrogation.

ASSIGNMENT OF ERROR NO. 5
The defendant requested the trial judge to read this special charge:
"Manslaughter, as defined in the law, and as it is applied to this case is defined as a homicide committed with the specific intent to kill or inflict great bodily harm, and further committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that an offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
"I charge you that you may consider the defendant's state of intoxication in light of the degree of the provocation in considering whether his blood had actually cooled or an average persons blood would have cooled."
It is admitted, in defendant's brief, that the general charge sufficiently covered the first paragraph.
The trial judge disallowed the second paragraph, stating that it was an incorrect statement of the law, and instead gave this instruction:
"The fact that the defendant was in an intoxicated condition at the time of the commission of the crime is usually no defense.
"However where the circumstances indicate that the defendant voluntarily became intoxicated and that his intoxicated condition precluded the presence of a specific criminal intent required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
"In order to convict the defendant of the offense charged, you must find beyond a reasonable doubt that he had a specific intent to kill or inflict great bodily harm.
"Thus, if you find that the defendant was in such an intoxicated condition that he did not have the specific intent to kill or inflict great bodily harm required to commit second degree murder or manslaughter, you must find the defendant not guilty."
The district judge's instruction embodied the particulars of LSA-R.S. 14:15, which reads:
"The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
"(1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.
"(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime."
This assignment is without substance.

ASSIGNMENT OF ERROR NO. 6
The defendant believes that insanity at the time the offense was committed had in fact been proved, mainly by competent medical evidence; and that, accordingly, the trial judge should have granted the motion for a new trial.
Three physicians testified, Drs. Samuel Andrews, Kenneth Ritter and Arthur Epstein.
Dr. Andrews, board certified in internal medicine, endocrinology and metabolism, examined the defendant on April 29, 1981, approximately six months after Scotty was shot, and concluded that defendant could have been suffering from hypoglycemia an abnormally small concentration of glucose *551 in the bloodin the early morning hours of November 2, 1980.
Dr. Ritter, a psychiatrist, saw the defendant for "... an hour to an hour and a half..." on May 21, 1981. In his opinion, based primarily on what the defendant told him, "... it's certainly possible that the man did not know the difference between right and wrong at the time."
Asked on cross examination if he can "... say for sure what condition..." defendant was in, Dr. Ritter said:
"No, sir, I can not. It's only from history that I obtained..."
The "history" Dr. Ritter relied on, as provided by the defendant, was that he (the defendant) had been drinking for at least 12 hours, that he had been smoking marijuana, that he had not eaten and that he was a diabetic and had not taken his prescribed medicine.
Dr. Epstein, an expert in psychiatry and neurology, also saw the defendant only one time, on May 25, 1981, for two hours. In response to an elongated hypothetical question, Dr. Epstein stated "... that the probability is that he did not know right from wrong."
However, on cross examination, Dr. Epstein said that if the defendant was neither intoxicated nor in a hypoglycemic state on November 2, 1980, "... I think he would know what he was doing."
To be exempted from criminal responsibility on the grounds of insanity, a defendant must persuade the jury that he had a mental disease or defect which rendered him incapable of distinguishing right from wrong with reference to the conduct in question.[3]
Here, the jury considered the medical evidence along with the lay testimony and the remainder of the evidence, and decided that the defendant had failed to prove by the necessary preponderance[4] that he was insane or even intoxicated at the time of the offense. The trial judge agreed with this conclusion, as evidenced by his denial of the motion for a new trial.
After reviewing the record, we cannot say that the jury and trial judge were wrong. A rational, objective fact-finder could well have concluded that the medical testimony, while scholarly, was largely based on defendant's self-serving revelations, and that it did not support the defendant's insanity plea.
None of the testifying physicians had actually treated the defendant for any mental, emotional or physical ailment. They were consulted only for the purpose of appearing as expert medical witnesses.
Apparently, 11 of the 12 jurors were not impressed.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 7
The trial judge erred, this assignment contends, in not granting a new trial because one of the jurors, Malger Stilwell, originally denied knowing the defendant or his family but later admitted that he knew Maurice Parker Sr., defendant's father.
Stilwell said at the motion for a new trial that he did not become aware that the defendant was Maurice Parker Sr.'s son until after he was sworn. He also stated that at the time the judge asked the jurors on voir dire if they knew the defendant, he was unaware of the relationship.
He further testified:
Q. The fact that you knew the Parkers, I mean, you knew the Parker family, is that
A. No, huh-uh. You got it wrong.
Q. All right. Okay.
A. I knew Maurice. I didn't know his family.
Q. All right.
A. I didn't even know the man was married. I didn't knew he had kids. And so, I didn't have no relation with the family. Because, I tended to my business and got my drinks and I didn't fool around Sun.

*552 Q. When did you realize that Richard Parker was one of the Parkers, was related to Maurice?
A. The day that I sat right there in that chair.
Also, he testified that the fact that the defendant was Maurice Parker Sr.'s son had no effect on the way he judged the case.
As in State v. Prejean, La., 379 So.2d 240, the defendant could not show that the juror had answered falsely on voir dire. In the absence of such evidence, a new trial is not justified.

ASSIGNMENT OF ERROR NO. 8
Defendant contends that the trial judge should have advised him of his right to waive trial by jury, in accord with LSA-C. Cr.P. Art. 780.
However, lack of technical compliance with Art. 780 will not constitute reversible error, as this Court held in State v. Sharp, 338 So.2d 654 (La.1976).
As in Sharp, the defendant does not claim that he was unaware of this right, only that it was not properly explained.
Defendant had the assistance of effective counsel who was presumptively aware of the right to waive a jury, and chose not to do so.

ASSIGNMENTS OF ERROR NOS. 9 AND 10
Defendant contends that the mandatory imposition of a sentence of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence for second degree murder constitutes cruel and unusual punishment.
This assertion has been consistently rejected by this Court. State v. Landry, 388 So.2d 699 (La.1980); State v. Daniel, 378 So.2d 1361 (La.1979); and State v. Brooks, 350 So.2d 1174 (La.1977).
Defendant further asserts that the mandatory sentence unconstitutionally denies the defendant the right to have the trial court exercise its discretion in imposing sentences under LSA-C.Cr.P. Arts. 893 and 894.1. The decision to assess mandatory life sentences for certain felonies is within the prerogative of the legislature. State v. Prestridge, 399 So.2d 564 (La.1981).
These assignments lack merit.

ASSIGNMENT OF ERROR NO. 11
Finally, defendant contends that the responsive verdict scheme for second degree murder unconstitutionally deprives him of the right to have the jury consider verdicts of attempted second degree murder, attempted manslaughter and negligent homicide. The verdicts responsive to second degree murder are guilty, guilty of manslaughter and not guilty, reference LSA-C.Cr.P. Art. 814.
As the "Official Revision Comments" following Art. 814 suggest, the legislature carefully considered various responsive verdicts for each of the enumerated offenses, and specifically omitted "attempt" from the second degree murder responsive verdicts.
With regard to negligent homicide, the elements are not the same as those of second degree murder; therefore negligent homicide was not listed as responsive.
We find no constitutional problem with these legislative determinations, and dismiss this assignment of error.
As this Court said in State v. Marse, 365 So.2d 1319 (La.1979), a defendant's ultimate protection is that if the State fails to prove the necessary elements of the offense charged or any of the offenses listed as responsive verdicts, the defendant is entitled to an acquittal.
Here the defendant could have been found not guilty, not guilty by reason of insanity or guilty of manslaughter if the jury chose to compromise.

CONCLUSION
For the reasons assigned, we are of the opinion that defendant Charles Richard Parker received a fair trial, and we affirm his conviction and sentence.
*553 CALOGERO, J., concurs with respect to assignments of Error # 4 defendant's statement was not introduced for its substantive content.
NOTES
[*] Judge H. Charles Gaudin of the Court of Appeal, Fifth Circuit, and Judges Israel M. Augustine, Jr. and Philip C. Ciaccio of the Court of Appeal, Fourth Circuit, participated in this decision as Associate Justices Ad Hoc joined by Justices Calogero, Dennis, Watson and Lemmon.
[1] Actually from seven to 11 minutes, according to witnesses.
[2] LSA-R.S. 15:481.
[3] LSA-R.S. 14:14.
[4] See LSA-C.Cr.P. art. 652.