PITMAN, J.
_jjA nonunanimous jury convicted Defendant Ahmed Rashad Morning as charged of aggravated rape. The trial court sentenced Defendant to the mandatory term of life imprisonment. Defendant appeals his conviction and sentence. For the following reasons, we affirm Defendant’s conviction and sentence and remand to the trial court for compliance with sex offender registration requirements.
FACTS
On October 15, 2012, the state filed a bill of indictment charging Defendant with one count of aggravated rape in violation of La. R.S. 14:42. On August 8, 2013, the state filed an amended true bill of indictment to specify that Defendant committed aggravated rape in violation of La. R.S. 14:42(A)(3). On November 20, 2012, Defendant pled not guilty. A jury trial began on September 10, 2013.
T.A.C.[1] testified that, on August 16, 2012, she was working as an escort who received “donations for companionship.” She testified that she never exchanged sex for money. She stated that she and Kimberly Fisher worked together and advertised on the website backpage.com. In August 2012, they came fi-om Texas to the Shreveport-B ossier area, staying at America’s Best Value Inn in Bossier City (“the hotel”), because “the donations were better.” She testified that Defendant called her to set up a half-hour meeting and then met her at the hotel. Defendant was nervous that Ms. Fisher was in the room, so Ms. Fisher left. T.A.C. stated that she |2and Defendant began talking and that Defendant commented “he was nervous because he had just got popped for this at the Horseshoe Hotel.... for prostitution.” She stated that she then asked for a $100 donation. Defendant refused to give it to her and she told him to leave. She testified that he then went to the bathroom and came back holding a knife, which she described as a big knife with a black handle that comes in a kitchen set. She stated that he then pulled the phone cord out of the wall, grabbed her and started choking her with the knife to her throat and told her he was going to kill her if she did not give him money. She stated that he then began raping her vaginally and forced her to perform oral sex on him. She testified that Defendant told her to call Ms. Fisher and tell her to bring money. She stated that she called Ms. Fisher, telling her that Defendant wanted a “two-girl special,” which was their code phrase for something *928 is wrong. She stated that Ms. Fisher then came back to the hotel and knocked on the door. T.A.C. opened the door and ran to the hotel office hysterically screaming. The manager put T.A.C. in a room and called the police. She then went back to her hotel room to get dressed. She testified that the police arrived, spoke to her for a few minutes and then transported her to the hospital. T.A.C. admitted that she gave two stories to the police. She explained that she was worried she would get in trouble if the police knew she was an escort, so she lied and said that her hotel room door was unlocked and Defendant came into the room and raped her. She stated that, once the police officers told her they were aware of her back-page.com advertisement, she told the truth about being an escort and about the events of the day.
hKimberly Fisher testified that she and T.A.C. had an escort business where they were paid a “donation” for their time and companionship and that they posted an escort listing on backpage.com along with their phone numbers. She testified that, in August 2012, she and T.A.C. traveled from Longview, Texas, to the Shreveport-Bossier area because they could earn greater “donations” in a bigger city. She stated that, on August 16,- 2012, while staying at the hotel, T.A.C. received a call from Defendant to arrange a meeting. Defendant arrived at the hotel at 4:15 p.m. and she then left to do some shopping. She explained that, after she had been gone for 45 minutes, she received a call from T.A.C. stating that Defendant would like a “two-girl special,” which was their code phrase meaning something was wrong. Ms. Fisher testified that she immediately went back to the hotel room and began banging on the door. She heard shuffling inside the room, and then:
[T.A.C.] opened the door and her face was pale white. She was crying and immediately she slammed the door into the defendant, ... who was behind the door and she just said, “Run, he has a knife. He’s trying to kill us.” And as soon as she said that I seen a glare from the knife_[S]he took off running. I ran after her until I seen that he was right beside me with the knife.
Ms. Fisher described the knife as a butcher knife with “little lines at the bottom” and a black handle. She stated that she ran to her car and pulled up behind Defendant’s car to get his license plate number. She admitted to police officers that she did not tell them the truth about being an escort because she was afraid of going to jail. She explained that, later that day, [¿when confronted by police officers about her backpage.com ad, she told them the truth about what had happened.
Viral Patel testified[2] that he works at the hotel as a front desk manager. He stated that, on August 16, 2012, he was in his office when he heard T.A.C. yelling for help and running naked in the lobby. He described her as “scared” and “shaking.” Mr. Patel stated that he took T.A.C. to a different hotel room to wait while he called the police. He testified that the hotel has surveillance cameras and that a camera recorded T.A.C. running in the hallway.[3]
Officer Jason Lowe, Officer Tyler Wolf, Detective Karen McDonald and Detective Kevin Jones, all employed by the Bossier City Police Department, testified at trial and offered very consistent testimony. Each testified that, on August 16, 2012, *929 they were dispatched to the hotel in response to a call that a rape had occurred there. The officers made contact with T.A.C., who appeared upset and was crying and shaking. Ofc. Wolf stated that T.A.C. and Ms. Fisher were separated and that the officers spoke to each woman individually. Ofc. Lowe and Ofc. Wolf stated that T.A.C. gave a description of the suspect as a black male with tattoos who appeared to be in his early thirties. Ofc. Wolf, Det. McDonald and Det. Jones all testified about T.A.C.’s account of the events. They stated that T.A.C. told them she was in the bathroom of her hotel room (Room 119) when a black | ñmale came into the room and raped her at knife point.[4] Det. McDonald testified that, following her conversation with T.A.C., T.A.C. was transported to the hospital to be examined by a sexual assault forensics examiner (“SAFE”) nurse.
Ofc. Wolf and Det. Jones testified that Ms. Fisher told them she had left the hotel room to go to the store. When she returned and knocked on the door, T.A.C. ran out of the room naked screaming “he’s trying to kill me” and “he has a knife.” Ofc. Wolf stated that Ms. Fisher told him she saw a large knife and a black man running out from behind the door.
Ofc. Wolf and Det. Jones noted that Ms. Fisher followed Defendant and was able to get the tag number on his vehicle and to describe the vehicle. Ofc. Lowe stated that he “ran” the vehicle tag number in Thinkstream (a vehicle identification computer program) and learned that the vehicle driven by Defendant was registered to a black female with the last name of Morning who had a Shreveport address. Ofc. Lowe stated that his search of the police department’s computer system for a black male between the ages of 25 to 35 with the last name of Morning revealed a man named Ahmed Morning (Defendant) with a photo that matched T.A.C.’s description of Defendant. Ofc. Lowe explained that other reports regarding Defendant came up during his investigation, including an incident at the Horseshoe Casino involving prostitution.
Det. McDonald and Det. Jones testified that, when they confronted T.A.C. about her and Ms. Fisher’s escort ads with provocative photographs |fion a website called backpage.com, T.A.C. began to cry and explained she did not tell them she was an escort because she did not think they would believe her story. Det. McDonald stated that T.A.C. then told her that:
[S]he had an appointment with this gentleman and once he arrived her friend left. At that point she asked him to put the donation on the table, which he didn’t put any money on the table. That made her uncomfortable so she asked him to leave. At that point he produced • the knife and raped her vaginally, anally, and orally.... [5] [0]nce her friend came back to the room she slammed the door on the suspect and was able to get out of the room and run outside naked to the office of the hotel.
Det. Jones testified that he confronted Ms. Fisher with the backpage.com ad, and she told him she initially did not tell the truth because she was afraid that the police officers would not help her and T.A.C. if they knew they were escorts. Det. Jones testified that Ms. Fisher then told him that:
*930 [T.A.C.] was contacted by phone by [Defendant] and had made an appointment to meet with her.... And called later and [T.A.C.] told him where they were at and what room number they were in.... Once ... he arrived at the room and Ms. Fisher at that point left the room to leave him and [T.A.C.] alone.... She said she went to the store.... [6] She said that at one point she got called from [T.A.C.] and was told that she needed to come back to the room because he wanted another person there.... So she returned to the room and that’s when she knocked on the door and heard the shuffling, and when the door opened the door got slammed into the wall and [T.A.C.] came running out of the room naked screaming help me.... [Defendant] came out and started to chase her, but then stopped and turned around and walked back towards the room. At that point Ms. Fisher said she backed up and got into her car and locked the door.
Det. McDonald and Det. Jones testified, that they participated in the processing of Room 119, where the alleged rape occurred. Both detectives |7noted that the telephone in the room had been pulled from the wall and that marijuana was found in the room. Det. Jones noted that condom wrappers were also found in the room. Det. Jones stated that, after processing Room 119, he viewed video surveillance from the hotel, which showed T.A.C. “running at a dead full speed sprint down that hallway ... completely naked.”
Det. McDonald and Det. Jones testified that they searched Defendant’s residence and recovered shoes that T.A.C. described Defendant to be wearing, condoms, clothing items and T.A.C.’s cell phone. Both detectives stated that officers recovered two knives that matched the description T.A.C. gave of the knife Defendant used when raping her, i.e., a kitchen knife with a black handle and serrated edges.
Det..McDonald testified that she spoke with Defendant once he was in custody on August 17, 2012, noting that she read Defendant his Miranda rights and that he waived those rights and then stated that:
[H]e had set up a date with [T.A.C.] and when he got there they did cocaine and marijuana, and talked, that they did not have sex at any point in time. She for whatever reason freaked out and ran out of the room naked and he got his keys and his forty dollars he had put on the table and left.
Det. McDonald stated that Defendant denied having a knife.
Brittany Hughes[7] testified that she is a registered nurse and works as a SAFE nurse, also referred to as a SANE (“sexual assault nurse examiner”) nurse, and collects forensic evidence from victims of sexual assault. She | stestified that she was on call on August 16, 2012, and met with T.A.C. in the emergency room at Willis-Knighton Hospital in Bossier City. Nurse Hughes stated that she received consent from T.A.C. to collect evidence and then obtained her medical history and a statement regarding what had happened. Nurse Hughes testified that she then collected T.A.C.’s clothing and swabbed different areas of her body to collect DNA samples. She also took photos of T.A.C. Nurse Hughes noted that the photographs showed “significant injuries,” including *931 bruising on T.A.C.’s right breast, bruising on her right lower back, bruising in the vaginal area, a vaginal laceration and anal lacerations. She opined that these injuries are consistent with signs of sexual assault, but, on cross-examination, acknowledged that it is possible that these types of injuries could have been caused by consensual sex.[8]
Jessica Esparza, Ph.D., testified that she is the DNA technical leader at the North Louisiana Criminalistics Laboratory.[9] She stated that she was the analyst who examined the evidence and wrote the report in this case. She explained that she examined the vaginal swab, the cervical swab, vaginal washings, the external genitalia swab, the perianal swab and the anal swab from the sexual assault kit of evidence collected from T.A.C. She stated that she also used reference samples from T.A.C. and Defendant when analyzing the evidence. Dr. Esparza testified that Defendant’s Y chromosome was present in the vaginal swab, indicating that Defendant had |asex with T.A.C. within 72 hours of the vaginal swab being taken. She clarified that 99.85 percent of all African-American males could be excluded as a match, with Defendant remaining in the .15 percent that could not be excluded.
Officer Melissa George of the Shreveport Police Department testified that, on June 22, 2012, she was working an undercover prostitution operation at the Horseshoe Casino with officers from other agencies. She stated that the officers placed an advertisement on the website back-page.com for sex acts for money with a phone number listed. The officers were assigned phones for the phone number posted on the website and she received a call from Defendant in response to the advertisement. She testified that she and Defendant arranged to meet to have sex in exchange for $140. She met him in the lobby of the casino’s hotel and then took an elevator to a hotel room. Once in the room, they discussed exchanging sex for money. She testified that she got up to go to the bathroom and told Defendant to put the money on the counter. Defendant then grabbed her arm. She stated that she went to the bathroom and locked the door and that the other officers then entered the room and arrested Defendant. She stated that, once Defendant was arrested, the officers discovered that he did not have any money, but did have a knife on the inside of his waist.[10]
| iñOn September 12, 2013, a non-unanimous jury[11] found Defendant guilty as charged of aggravated rape. On November 12, 2018, the trial court sentenced Defendant to the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence.
On November 14, 2013, Defendant filed a motion to reconsider sentence. He requested that the trial court reconsider his sentence because he was convicted by a non-unanimous jury and the imposition of a life sentence when the jury was non-unanimous constitutes cruel, excessive or unusual punishment in violation of La. Const. Art. I, § 20 and § 16. On November 19, 2013, the trial court filed a ruling *932 denying Defendant’s motion to reconsider sentence.
Defendant appeals his conviction and sentence.

DISCUSSION

Sufficiency of the Evidence

In his first assignment of error, Defendant argues that there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of the offense of aggravated rape. Defendant contends that the testimony of T.A.C. and Ms. Fisher was not credible because they admittedly lied to police officers. He emphasizes that the two women initially told an inaccurate story of how the incident occurred and later changed their story when officers discovered they were escorts. Defendant also points to the testimony of T.A.C. that she did not trade sex for donations, but only companionship, despite the presence of condoms and lubricant in the hotel Inroom. He further claims there was no definitive evidence he raped T.A.C. at knifepoint and suggests that the physical injuries to T.A.C. could also be consistent with a prostitute who had two partners within a short period of time.
The state argues that T.A.C.’s testimony was convincing and was supported by the testimony of Ms. Fisher, the police officers, the SAFE nurse and a DNA analyst.
The standard of appellate review for a sufficiency of the evidence claim is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonáble doubt.” Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hearold, 603 So.2d 731 (La.1992); State v. Smith, 47,983 (La.App.2d Cir.5/15/13), 116 So.3d 884. See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writ denied, 02-2595 (La.3/28/03), 840 So.2d 566, and writ denied, 02-2997 (La.6/27/03), 847 So.2d 1255, and cert. denied, 540 U.S. 1185, 11⅞124 S.Ct. 1404, 158 L.Ed.2d 90 (2004), citing State v. Tolliver, 35,930 (La.App.2d Cir.5/8/02), 818 So.2d 310, and State v. Bacon, 578 So.2d 175 (La.App. 1st Cir.1991), writ denied, 93-0694 (La.3/30/95), 651 So.2d 857.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder’s discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
La. R.S. 14:42(A)(3) defines aggravated rape as follows:
A. Aggravated rape is a rape committed upon a person sixty-five years of age *933 or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
[[Image here]]
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence presented at trial to convict Defendant of the aggravated rape of T.A.C. The physical evidence from the sexual assault |1skit, the testimony of the officers regarding T.A.C.’s demeanor following the rape, the testimony of Ms. Fisher and T.A.C. and the testimony regarding Defendant’s previous involvement in a similar situation at the Horseshoe Casino all support the jury’s verdict of guilty as charged. Regarding the dangerous weapon, i.e., the black-handled knife with a serrated blade, the jury was shown knives that were seized from Defendant’s residence. Both T.A.C. and Ms. Fisher testified that these knives resembled the knife used during the rape and which Defendant was holding as he chased them down the hall of the hotel. Ofc. George and Sgt. Perry both testified that Defendant had a similar knife on his person during the Horseshoe Casino incident.
Furthermore, the jury clearly chose to accept T.A.C.’s testimony as credible and presumably accepted her and Ms. Fisher’s explanations that they were initially reluctant to admit they were escorts for fear of going to jail or that the authorities would not believe T.A.C. had been raped It was within the discretion of the trier of fact to make such credibility determination, and this Court will not disturb this determination on appeal.
Therefore, we find that this assignment of error lacks merit.

Excessive Sentence

In his second assignment of error, Defendant argues that the trial court erred by imposing an unconstitutionally harsh and excessive sentence. Defendant contends that the mandatory sentence of life imprisonment is excessive because he was convicted by only ten of twelve jurors.
114The state argues that the sentence imposed was a mandatory sentence and was well deserved based on the facts of the case.
La. R.S. 14:42(D)(1) states that “[w]ho-ever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.”
It is within the legislature’s prerogative to determine the length of the sentence imposed for the crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. State v. Armstrong, 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, 99-3151 (La.4/7/00), 759 So.2d 92, citing State v. Dorthey, 623 So.2d 1276 (La.1993). The decision to assess mandatory life sentences is within the prerogative of the legislature. Id., citing State v. Parker, 416 So.2d 545 (La.1982). The assertion that the mandatory life sentence for aggravated rape is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Chandler, 41,063 (La.App.2d Cir.9/8/06), 939 So.2d 574, writ denied, 06-2554 (La.5/11/07), 955 So.2d 1277, citing State v. Stokes, 36,212 (La.App.2d Cir.9/18/02), 828 So.2d 631, writ denied, 02-2807 (La.9/5/03), 852 So.2d 1023, and State v. Ingram, 29,172 (La.App.2d Cir.1/24/97), 688 So.2d 657, writ denied, *934 97-0566 (La.9/5/97), 700 So.2d 505. When there is a constitutional mandatory sentence, a trial court need not justify, under La.C.Cr.P. art. 894.1, a sentence it is legally required to impose. State v. Koon, 31,177 (La.App.2d Cir.2/24/99), 730 So.2d 503, citing State v. Williams, 445 So.2d 1264 (La.App. 3d Cir.1984), writ denied, 449 So.2d 1346 (La.1984).
|1bTo rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that “[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.” State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, quoting State v. Young, 94-1636 (La.App.4th Cir.l0/26/95), 663 So.2d 525, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223.
Defendant has failed to show that his particular circumstances are an exception to the constitutional application of the mandatory sentence for aggravated rape. The only basis provided by Defendant for a sentencing departure is the 10-2 verdict (rather than a unanimous verdict). We do not find that a nonunanimous verdict is an unusual circumstance warranting a deviation from the mandatory sentence imposed by the legislature; and, therefore, Defendant’s sentence is not unconstitutionally excessive.
Accordingly, this assignment of error lacks merit.

ERROR PATENT

The offense of conviction, i.e., La. R.S. 14:42 (aggravated rape), is a “sex offense” as defined by La. R.S. 15:541(24)(a), and thus carries the requirements of sex offender notification and registration under La. R.S. 15:542 and 15:543. This record does not show that the trial court provided Defendant the forms or oral advice to which he is entitled. The matter, therefore, is remanded solely for the purpose of compliance with [1fithese statutes. State v. Hough, 47,308 (La.App.2d Cir.8/1/12), 103 So.3d 477, writ denied, 12-1936 (La.3/8/13), 109 So.3d 357; State v. Scott, 42,997 (La.App.2d Cir.2/13/08), 975 So.2d 782.

CONCLUSION

For the foregoing reasons, the conviction and sentence of Defendant, Ahmed Rashad Morning, are affirmed. We remand to the trial court for compliance with sex offender registration requirements and for a minute entry confirming that fact.
AFFIRMED AND REMANDED.

. To protect her privacy, the victim will be referred to by her initials, T.A.C., pursuant to La. R.S. 46:1844(W).

. Tammy Bachelor, a front desk manager at America's Best Value Inn, also testified at trial. Her testimony was consistent with Mr. Patel’s testimony.

. At this point in the trial, the jury viewed the surveillance video.

. Det. Jones added that T.A.C. stated that Defendant made a comment that he had previously been caught with a white female at the Horseshoe Casino.

. Det. McDonald noted that the rest of T.A.C.’s statement from this point was consistent with her original statement.

. Det. Jones noted that the rest of Ms. Fisher's statement from this point was the same as her first statement.

. Nurse Hughes provided a detailed history of her education and training and was accepted as an expert in the field of sexual assault nursing, specifically as to SAFE or SANE nurse procedures and processes.

. Ofc. Chad Boyett of the Bossier City Police Department testified as to the chain of evidence collected by Nurse Hughes.

. The parties stipulated that Dr. Esparza is an expert in the field of forensic biology.

. Sergeant Robert Perry of the Louisiana State Police also testified about the undercover operation and gave testimony consistent with Ofc. George’s testimony.

. Ten jurors voted to convict Defendant as charged. Two voted not to convict Defendant as charged.