Judgment rendered February 25, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,772-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

JIMMY RAY COCKERHEM                    Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 386,449

Honorable Donald E. Hathaway, Jr., Judge

* * * * *

THE HARVILLE LAW FIRM, LLC                    Counsel for Appellant
By: Douglas Lee Harville

JAMES E. STEWART, SR.                    Counsel for Appellee
District Attorney

JASON WALTMAN
Assistant District Attorney

* * * * *

Before PITMAN, STEPHENS, and HUNTER, JJ.

**PITMAN, C. J.**

Defendant Jimmy Ray Cockerhem appeals his conviction for the crime of second degree murder and his sentence of life in prison without benefit of parole, probation or suspension of sentence. For the following reasons, Defendant's conviction and sentence are affirmed.

**FACTS**

Defendant was indicted for the second degree murder of Gary Lee, a violation of La. R.S. 14:30.1, which occurred on or about November 22, 2021, in Caddo Parish. Defendant's attorney gave notice that he intended to present evidence that Defendant shot Lee in self-defense. A jury trial was held, at which the following evidence was adduced:

Corporal Erik Powell, of the Shreveport Police Department ("SPD"), testified that he responded to a call about a shooting near the corner of Alda and Willie Mays Streets. He arrived at the scene around 12:50 p.m. and saw the body of the victim, Lee, lying on top of a blue broom handle by his house. There was a vacant lot between Lee's house and Willie Mays Street. Cpl. Powell's body camera video from that day was shown to the jury. Cpl. Powell was shown pictures of a shovel leaning against Lee's house, but he could not say when the shovel had been placed there. He testified that the shovel was not within arm's reach of the victim.

Sebastian Gulder, crime scene technician for the SPD, photographed the scene and identified pictures with a green rake and a shovel leaning against a house. He also photographed the decedent's body in front of the house lying on top of a blue broom handle.

Amber Futch, crime scene investigator for SPD, testified that she did not recover a shell casing or a firearm at the scene. She took a video of the

scene and took measurements from the driveway of 1733 Alda (Defendant's home) to the driveway of 1735 Alda (Lee's home).

Pamela Burns testified that she was picking up her grandchild from his father's (Arthur McCray) house at 1734 Alda, across the street from Lee's house, when she saw a car turn from Alda onto Willie Mays Street and park next to a vacant lot. While she was in McCray's driveway, she saw a man holding a gun in his hand get out of that car and walk across the vacant lot toward Lee. Because she saw he had a gun and her grandchild was exiting McCray's house, she began screaming at them to get back in the house. McCray is wheelchair-bound and was waiting at the open door when the child ran back into the house. Burns testified that the man with the gun walked up to Lee and shot him. She stated that she called 911, went to a local library and told a policeman what she had seen and then went home. She returned to the scene at the request of the police.

Burns further testified that McCray's house was across the street from the victim's house and that she saw Lee standing in his own driveway raking leaves. She never heard any words exchanged between the two men but stated she was in her car and would not have heard if they had been talking to each other. She stated that the shooter approached from across the field and that Lee never looked up before he was shot. She also stated that after the shooting, the man with the gun walked back to his car and left.

On cross-examination, Burns stated she had a clear view of the man with the gun as he crossed the field. She testified that she was trying to get out of her seatbelt and was ducking at the same time but that she saw the gun in his left hand. She described him as a light-skinned man wearing a hat

with a ponytail on it. She would not be able to identify his face in a lineup without the hat and ponytail.

Corporal Adam McEntee, SPD, was a homicide detective who responded to the scene as a secondary detective. Pursuant to his investigation, he was able to identify Defendant as the suspect who had left the house next door to the victim's house. He testified that the day after the incident, Defendant and his attorney came to the station, where Defendant was read his Miranda warning and signed the acknowledgment form. He, Defendant and his attorney returned to the scene on Alda along a specific route because Defendant had stated that he had discarded the firearm in Twelve Mile Bayou near some construction. They drove to 1700 Alda, and the scene from Defendant's point of view was recreated insofar as it showed placement of people's houses and where the body had been located.

Cpl. McEntee further stated that he had been told that a person named Michael Wilson, who lived on Alda, claimed he had witnessed the shooting; but, when he and other officers stopped him in the street to question him, he denied having ever told anyone that he was a witness.[1] Cpl. McEntee was asked if Defendant told him that Lee had been brandishing the shovel at him before the shooting, and he responded that Defendant had said so, but he did not secure the shovel or take it into evidence. The state rested.

Defense called Robert Major Fant, who was formerly an investigator with the Caddo Parish Sheriff's Office but at the time of the trial was a licensed private investigator. He was hired to take measurements at the

---

[1] While this seems to be an insignificant fact, Defendant has raised an issue in this appeal that is pertinent to Michael Wilson's testimony when he was called to the stand by the defense.

scene on Alda, including the measurements from the driveway at 1734 Alda to the corner of a building at 1735 Alda, from the driveway to the body location and from a fence line to a driveway located on Willie Mays. He drew a diagram of the measurements he took, which was shown to the jury.

Three character witnesses were called who all testified they had known Defendant for many years. All three said he had a reputation for peacefulness, and one said he had never been in trouble or fought with anyone.

Michael Wilson took the stand, and Defendant's attorney attempted to elicit testimony from him regarding the rumor that he had told someone he witnessed the crime. He denied having said anything to anyone about it and stated that he did not know why he had been called to testify. In fact, he stated he was not even in Shreveport on the day of the incident. He was asked if he ever told Theardis Owens that he saw Lee with a shovel on the day of the incident, and the state objected to hearsay evidence. After a discussion at the bench, the witness was allowed to leave the stand but was asked to wait outside. The defense attorney asked to proffer his testimony, but no decision was made at that point in the trial. The issue of the proffer arose again later.

Defendant took the stand to testify on his own behalf and stated that on the day of the shooting, he began his day by going to the store for his wife, who had just gotten out of the hospital. As he was driving down Legardy, he saw Lee walking toward him. As he drew up beside Lee, Lee lashed out and started making "all kinds of gestures at me" that shocked him. He said that even after he passed, he looked in the rear view mirror and Lee was still making gestures at him. He stated that when he returned from

4

the store, Lee was in the same place and made gestures at him again. He could not hear Lee speaking because his windows were up, but he saw Lee's mouth moving, and he had a "crazed look on his face . . . like he was angry." He did not know why Lee was angry at him and claimed he had never done anything to him.

Defendant further stated that he and his wife left their house to go eat, and Lee was sitting on Lee's porch; but when he saw them leave their house, he ran out to the road and began acting like he was raking leaves. When Defendant and his wife drove slowly by, Lee was just a few feet from the driver's side window and was acting like he was going to bash in the window. He wondered what was wrong with Lee that day and kept driving, but Lee continued to make angry gestures at him. He turned on to Willie Mays Street, and then decided to stop and ask what problem Lee was having that morning.

Defendant stated that he had his handgun in the car because it had been left there the night before when he went to Whataburger at 1 a.m. and that he carried it for self-protection. He said he put the 9 millimeter gun in his pocket when he left his car because Lee had threatened him before. He walked across the vacant lot but stopped before crossing onto Lee's property. He testified that Lee was not raking leaves but was waiting for him. He said he asked Lee what his problem was, and Lee told him to leave his property. He told Lee he was not on his property, and then Lee grabbed the shovel that was leaning against the house behind him and approached him with it in a very aggressive manner. He stated that was when he pulled the gun out of his pocket.

Defendant testified he told Lee not to keep coming at him, but Lee continued, and when he got to him, "he cocked back to try to hit me and I just pulled the trigger, you know. My eyes was closed. I ain't never been in no situation like that before. I mean, he was fixing to hit me." He stated that for a split second he thought about turning around and trying to run "to keep this stuff from happening," but Lee was so close he thought Lee could hit him in the head or the face with the shovel. He stated that he was not in the best of shape and that Lee was only four or five feet away from him and was swiftly approaching him. He stated he fired the shot because he was afraid of Lee, who had threatened him before.

After he fired the shot, Defendant returned to his car and took his wife to her sister's house because he was afraid of what would happen. He testified that he then drove to Twelve Mile Bayou and threw the gun off the bridge because he "felt so bad about whatever I done." He said that he and Lee had been friends for years and that he was like a little brother to him. He had known him since Lee was six or seven years old. Things changed between them when Lee got out of the military. Lee made threats against him several times and told him some day he would sneak up behind him and "bust his head wide open." He testified that Lee had attacked him at a store one day and hit him with what felt like a can on the side his head. He stated that it knocked him out for a few seconds, and when he came to, Lee was kicking and hitting him.

On cross-examination, Defendant was shown the picture of the body on top of the blue broom handle and was asked if it was his testimony that after Lee fell, and Defendant left the scene, someone came and removed the

6

shovel he had supposedly been holding and replaced it with the blue broom. He replied affirmatively.

Michael Wilson was recalled, and the defense attorney attempted to impeach his earlier trial testimony questioning why he was even called to testify. Defendant's attorney wanted to ask him whether he told Theardis Owens that he saw Lee attempt to strike Defendant with a shovel before Defendant shot Lee. The defense attorney attempted to call Owens, but the trial court refused to allow him to testify, even as part of a proffer. Defendant placed his objection on the record.

Carl Wayne Theus testified that he knew Defendant and had personal knowledge of direct threats of death or great bodily harm made by Lee toward Defendant. He had witnessed Lee accosting Defendant, using profanity and yelling. However, there were never any physical attacks.

Stanford Waites and Bertha Lee Morris, Defendant's sister-in-law, and Ora Lee Cockerhem Bedford, Defendant's sister, testified that Lee had a reputation for violent behavior.

Calvin Cockerhem, Defendant's brother, testified that he had known Lee his whole life. He stated that although Lee was peaceful in his earlier life, after he came home from the military, his entire attitude changed toward him and his family and that the Cockerhems could not even go outside or he would "pop off." He witnessed Lee threatening them at the edge of the driveway several times, throwing gang signs, daring them to walk to the edge of the driveway and telling them what he would do if they did. He stated that they called the police a few times, and Lee was arrested once after fighting with the police. He stated that he had seen Lee walking around the yard holding a pipe in a threatening manner toward Defendant.

7

A unanimous jury found Defendant guilty of second degree murder. Sentencing was held on November 12, 2024. The trial court listed aggravating and mitigating factors and stated that the mitigating factor was that Defendant had no history of prior delinquency or criminal activity except a simple battery 20 years prior to the instant crime. Defendant was 66 years old and had a high school education, was employed and owned his own business for many years. The trial court sentenced him to life in prison without benefit of parole, probation or suspension of sentence and informed him of his right to appeal and to post-conviction relief.

A motion to reconsider sentence was filed and denied. This appeal followed.

## DISCUSSION

*Sufficiency of the evidence*

Defendant argues that the state failed to carry its burden of proof that he did not shoot Lee in self-defense. He contends that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. He argues that he and Lee have had a one-sided contentious relationship for many years, that Lee threatened his life on many occasions and that Lee committed physical violence upon him at least once. Defendant claims he reasonably acted to defend himself when Lee approached him so aggressively and at such close range. Defendant contends that the state did not present the proof necessary to counter his testimony of the event, despite the testimony of Pamela Burns. Defendant also argues that he was not

acting with criminal intent and any reasonable juror could have found that the facts established a reasonable hypothesis of innocence.

The state notes that it has the burden of proof to show Defendant did not act in self-defense when he walked across a vacant lot and shot the victim, left the scene and then threw the gun in the bayou. It contends that Pamela Burns, the only eyewitness to the crime, testified that she saw Defendant stop his car, walk across the field with the gun in his hand and shoot the victim in the head. Nothing in her testimony indicated the action taken was in self-defense.

The state also argues that the evidence shows that Defendant was the aggressor in this case and that he has no right to claim self-defense. He was the person who brought the deadly weapon into a conflict of his own making, and he never withdrew from it in such a manner that his adversary knew or should have known that he wanted to withdraw and discontinue conflict.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now codified in La. C. Cr. P. art. 821, does not afford the appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Johnson*, 55,254 (La. App. 2 Cir. 8/9/23), 370 So. 3d 91.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 3/28/03), 840 So. 2d 566, *writ denied*, 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed 2d 90 (2004).

When a defendant challenges the sufficiency of the evidence in a self-defense case involving a homicide, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Parks*, 56,382 (La. App. 2 Cir. 8/27/25), 419 So. 3d 404. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger or when committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. La. R.S. 14:20 (A)(1) and (2). The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own

life or person if he attempted to prevent the felony without the killing. La. R.S. 14:20(A)(2). A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21.

Viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found beyond a reasonable doubt that this homicide was not committed in self-defense. The only eyewitness to this event, Pamela Burns, testified that she was across the street and that she saw Defendant stop his car, get out with a gun and walk across the field with the gun in his hand and shoot the victim without any provocation on the victim's part. She did not see any brandishing of a shovel or any other implement before Defendant shot the victim and he fell. There was nothing in her testimony to indicate Defendant was in an immediate threat of danger; and, in fact, he was the one who was the aggressor in the incident and showed no signs of retreating from the alleged danger he felt he was facing.

For these reasons, we find the state proved to a reasonable jury that this act was not committed in self-defense, and this assignment of error is without merit.

### Proffer of Evidence

Defendant argues that the trial court prevented him from exercising his right to cross-examine a witness when it prohibited him from introducing testimony that Michael Wilson, contrary to his trial testimony, told Theardis Owens that Wilson saw Lee attempt to strike Defendant with a shovel before

11

Defendant shot Lee. The defense attorney attempted to call Owens, but the trial court refused to allow him to testify, even as part of a proffer. Thus, Defendant argues that this error prevented him from exercising his fundamental right to present a complete defense through cross-examination of Wilson.

The state argues that the trial court did not err when it refused Defendant's request to proffer Owens's testimony to impeach Wilson's alleged prior inconsistent statements. The trial court ruled that Owens's testimony could not be offered for the truth of the matter as the defense hoped to do.

The state contends that this case does not involve the right of confrontation or meaningful cross-examination because Wilson was not called by the state in its case in chief. He was called by Defendant and was subject to direct examination by him, not cross-examination. The alleged inconsistent statement was only corroborated by Defendant's self-serving testimony and not by an independent witness. The state argues that this issue is subject to harmless error analysis, and the overwhelming evidence of guilt in this case renders any error in this regard harmless.

"Hearsay" is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C).

La. C.E. art. 607 concerns attacking and supporting credibility generally and La. C.E. art. 607(D)(2) concerns attacking credibility extrinsically and states:

> Other extrinsic evidence, including prior inconsistent
> statements and evidence contradicting the witness' testimony, is
> admissible when offered solely to attack the credibility of a

12

witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

In this case, the original alleged declarant, Wilson, was a defense witness. Instead of supporting Defendant's claim that he had witnessed the incident, he denied being in Shreveport that day. He also denied having said anything about it to Owens. Owens was also not present at the scene of the murder. The only evidence he could possibly have given was that Wilson made a hearsay statement to him. Thus, the only use for Owens's testimony would be for impeachment of Wilson's testimony, i.e., as evidence on the issue of credibility.

Based on La. C.E. art. 607(D)(2), impeachment is subject to the trial court determining that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues or unfair prejudice. In this case, the trial court found that Defendant was attempting to proffer Owens's testimony to prove the truth of the matter that Lee was brandishing a shovel at Defendant at the time of the murder. The information could not be used to prove the truth of the matter. Thus, the trial court did not err in refusing the proffer of Owens's testimony, and this assignment of error is without merit.

*Excessive Sentence*

Defendant contends his sentence to life in prison without benefit of parole, probation or suspension of sentence is constitutionally excessive and is subject to review. He argues that the evidence showed that he led an exemplary life prior to the shooting and that he is exceptional among those convicted of murder. He argues that he was known as someone who abided

13

by the law; was known for his peacefulness, community support, and family support; and had a history of working as an employee and an employer. He admits his conduct in this matter was serious, but claims it was an aberration; and, as such, he is a victim of the legislature's failure to allow the trial court to fashion a sentence that is meaningfully tailored to his circumstance. He contends that character and reference letters as well as medical records to the trial court prove that a lesser sentence would be sufficient punishment.

The state argues that the sentence for second degree murder is life in prison without the possibility of parole, probation or suspension of sentence, and that the trial court correctly examined all factors necessary before finding the mandatory sentence appropriate.

An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. *State v. Ivory*, 54,886 (La. App. 2 Cir. 1/11/23), 355 So. 3d 1157, *writ denied*, 23-00275 (La. 1/10/24), 376 So. 3d 132. First, the record must show that the trial court complied with La. C. Cr. P. art. 894.1. *State v. Smith*, 433 So. 2d 688 (La. 1983); *Ivory*, *supra*. Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So. 2d 1, *citing State v. Bonanno*, 384 So. 2d 355 (La. 1980).

Where there is a mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose. *Ivory*, *supra*. The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without the

benefit of parole, probation or suspension of sentence. La. R.S. 14:30.1(B). Louisiana appellate courts have repeatedly rejected the argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution. *State v. Parker*, 416 So. 2d 545 (La. 1982); *Ivory, supra*.

To rebut the presumption that the mandatory minimum sentence is constitutional, a defendant must clearly and convincingly show that he is exceptional, which means that because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case. *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So. 2d 672; *Ivory, supra*.

The mandatory sentence of life imprisonment for a conviction of second degree murder is presumed to be constitutional, and Defendant failed to demonstrate that he is an "exceptional" defendant for whom a downward departure from the statutory minimum sentence is required. The judge who sentenced Defendant also heard the evidence at trial, considered all the pertinent factors, including aggravating and mitigating ones, and did not conclude that a downward deviation from the mandatory sentence was warranted.

The trial court cited La. C. Cr. P. art. 894.1(A) and found many applicable factors. Aggravating factors included that the commission of the crime manifested deliberate cruelty, that he used threats and actual violence in the commission of the crime resulting in permanent injury and that he used a dangerous weapon in the commission of the crime. The one mitigating circumstance was that Defendant led a law-abiding life for a

substantial time before the homicide. The trial court reviewed Defendant's education, family and employment history and noted that he was 66 years old. The trial court found the mandatory sentence was appropriate.

Based on the foregoing, we find the sentence of life in prison without benefit of parole, probation or suspension of sentence to be appropriate. For these reasons, this assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, Defendant's, Jimmy Ray Cockerhem, conviction of second degree murder and his sentence of life in prison without benefit of parole, probation or suspension of sentence are affirmed.

**AFFIRMED.**

16